IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 23, 2020 Session

## STATE OF TENNESSEE v. ROBERT EDWARD SEATON

**Appeal from the Criminal Court for Knox County
No. 113217        G. Scott Green, Judge**

### No. E2019-01225-CCA-R3-CD

Following a jury trial, the Defendant, Robert Edward Seaton, was convicted of facilitation of theft of property valued at $2,500 or more but less than $10,000, a Class E felony, and one count each of vandalism, evading arrest, and driving with a revoked license, second offense, Class A misdemeanors.  See Tenn. Code Ann. §§ 39-11-403, -14-103, -14-105, -14-408, -16-603, 55-50-504.   In this appeal as of right, the Defendant contends (1) that the trial court erred by denying the Defendant's motion for a mistrial when a court officer, who was acting as jury custodian, was called and sworn as a rebuttal witness; (2) that the court erred by denying the Defendant's motion for a mistrial after the court elicited from a defense witness the name of the witness's father-in-law, who was "a notorious criminal and murderer"; (3) that the court erred by admitting reputation or opinion evidence from three law enforcement officers regarding a defense witness's character for truthfulness; (4) that plain error occurred when the State cross-examined a defense witness regarding prior criminal behavior not resulting in a conviction; and (5) that the cumulative effect of these errors deprived the Defendant of a fair trial.   Following our review, we conclude that the admission of reputation and opinion evidence from law enforcement officers constitutes reversible error such that the Defendant is entitled to a new trial.   Alternatively, we conclude that the Defendant would be entitled to relief due to cumulative error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;
Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Eric Lutton, District Public Defender[1]; Jonathan Harwell (on appeal), Assistant District Public Defender; and Kate Holtkamp and Marshal Jensen (at trial), Assistant District Public Defenders, for the appellant, Robert Edward Seaton.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott and Christy Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND[2]

This case arises from a March 9, 2018 incident at Southern Grounds Landscaping ("Southern Grounds") on Oak Ridge Highway in Knoxville. On that date, a John Deere Skid Steer machine, referred to during these proceedings as a "Bobcat," was taken from the Southern Grounds property to the parking lot of a neighboring Masonic lodge without the permission of its owner, Brandon Lawson ("Mr. Lawson"). Thereafter, the June 2018 session of the Knox County Grand Jury charged the Defendant with two counts of theft of property valued at $10,000 or more but less than $60,000; two counts of vandalism related to a damaged fence at Southern Grounds and damage to Thomas Wright's lawn, respectively; evading arrest; and driving with a revoked license.

The proof adduced at trial established that around 9:00 p.m. on March 9, 2018, the Defendant, along with Douglas "Drew" Lawson ("co-defendant Lawson") and Justin Hammontree,[3] arrived at Southern Grounds in the Defendant's son's truck, which had an attached trailer, and parked it behind the Masonic lodge. Co-defendant Lawson was Mr. Lawson's brother and had previously worked at Southern Grounds and had been trained to operate the Bobcat; Mr. Lawson testified that he fired co-defendant Lawson for theft two months before the incident and that co-defendant Lawson was "not an honest person."

---

[1] Mark E. Stephens was the District Public Defender during the Defendant's trial and at the time the Defendant's appeal was filed on July 10, 2019. In the pendency of this appeal and before the Defendant's appellate brief was filed, Mr. Stephens retired from public service and Mr. Lutton was appointed as his successor.

[2] The Defendant does not contest the sufficiency of the evidence on appeal. In the interest of efficiency, we have abridged the trial testimony to contain only the facts and context necessary to examine the issues on appeal.

[3] The record reflects that the Defendant was indicted and tried separately from his co-defendants.

Anthony McNeal, a Southern Grounds employee who lived in a recreational vehicle on the property and served as a security guard, testified that just before the incident, he lost internet connection in his residence and went outside to investigate. Mr. McNeal saw a man he believed to be co-defendant Lawson[4] start the Bobcat and drive it from the Southern Grounds lot. The man drove the Bobcat through a wooden fence, across a neighboring business's lawn, and ultimately to the Masonic lodge's parking lot, where the three men began to load the Bobcat onto the trailer. As Mr. McNeal ran up to the men, he noted that the man driving the Bobcat was wearing a brown hooded sweatshirt with the hood raised; he assumed the man was co-defendant Lawson because he knew how to start the Bobcat.

When Mr. McNeal confronted the men, the Defendant had a "verbal confrontation" with Mr. McNeal while the other two men unloaded the Bobcat from the trailer. According to Mr. McNeal, the Defendant ran toward him, yelled, and stated, "[T]his was bulls--t and that he had a right to it and everything." Mr. McNeal noted that the Defendant moved behind him as they argued, and Mr. McNeal opined that the Defendant meant to divert his attention. Mr. McNeal agreed that the Bobcat's engine was loud and that he and the Defendant had to stand close together in order to be heard.

At some point during Mr. McNeal's encounter with the men, he called Mr. Lawson and asked him to come to Southern Grounds because "someone [was] taking equipment." Mr. Lawson heard Mr. McNeal tell someone to "put it down or back it off" before the call disconnected. Mr. McNeal saw the third man place the trailer's ramp into the truck bed, then enter the truck; the Defendant then entered the driver's seat of the truck and drove away. The parties stipulated that the Defendant's driver's license was revoked at the time of the incident.

After Mr. McNeal and Mr. Lawson respectively called 911, Knox County Sheriff's officers located the truck a short distance away. A police cruiser pulled behind the truck with its blue lights activated; the truck turned into a subdivision; and it traveled between two houses in a cul-de-sac, ultimately crashing into an embankment bordering a steep, wooded hill, which was described as a "ravine" containing thorns, tall grass, and snakes. The truck caused damage to Thomas Wright's yard; Mr. Wright testified that he heard the crash and identified photographs of resulting damage to his lawn.

After the crash, the three men exited the truck; co-defendant Hammontree fell and was arrested near the truck; and the Defendant and co-defendant Lawson ran down the embankment into a woodline, where they were subsequently located by officers using

---

[4] It was not alleged at trial that the Defendant took the Bobcat, but it was disputed which of the other two men drove it from the Southern Grounds lot.

night-vision goggles. Officer Michael Adkins testified that he ordered the Defendant to come out of the woodline, but the Defendant did not comply. After sending his police dog to the Defendant's location, Officer Adkins and Officer Marcus Parton walked to the Defendant, and Officer Parton arrested him. Another officer's body camera recording was received as an exhibit and reflected officers' bringing the handcuffed Defendant down a steep, wooded hill. The Defendant was wearing a long-sleeved blue shirt with a white undershirt.

Mr. Lawson arrived at Southern Grounds after the Defendant and co-defendants had left. After the police finished their onsite investigation in the early hours of the morning, Mr. Lawson viewed a surveillance recording, which he described for the jury. According to Mr. Lawson, the recording showed a man who was not co-defendant Lawson[5] walking from the Southern Grounds fence to an irrigation box marking the location of the underground internet line, pausing there, and then walking to the Bobcat. Mr. Lawson agreed that co-defendant Lawson knew about Southern Grounds's security cameras. Mr. Lawson averred that the internet line was cut, although he also described previous damage to the line that had not yet been fully repaired at the time of the incident. The essence of the testimony was that the surveillance recording was lost a short time after the incident when it failed to upload to a "cloud" server backup.

The Defendant testified that he worked in landscaping during the summer and in "mechanical work" during the winter. The Defendant met co-defendant Lawson, who also worked in landscaping and irrigation, five years before the trial. At the time of the incident, the Defendant believed that co-defendant Lawson co-owned Southern Grounds with Mr. Lawson.

The Defendant testified that in late January or early February of 2018, co-defendant Lawson proposed a work trade in which the Defendant would perform irrigation work for co-defendant Lawson in exchange for co-defendant Lawson's help clearing land on the Defendant's property. The trade was supposed to occur the weekend of March 9, 2018. The Defendant anticipated that they would load the necessary equipment onto his trailer and take it to the Defendant's house in order to "get an early start" on Saturday morning.

The Defendant testified that co-defendant Lawson drove the Defendant's son's truck to Southern Grounds because the Defendant's driver's license had been revoked. The Defendant stated that as they approached Southern Grounds, co-defendant Lawson explained that he parked at the Masonic lodge "all the time . . . because it's easy to get the trucks and trailers in." The Defendant elaborated that they parked at the Masonic lodge

---

[5] Mr. Lawson explained that co-defendant Lawson walked with a pronounced limp at the time of the incident and that the man on the recording had an average gait.

because Southern Grounds had too short an entryway to fit a truck and trailer, that other vehicles were blocking the entryway, that Oak Ridge Highway was a busy road, and that the Masonic lodge had a well-lit driveway that would permit the truck to exit onto Oak Ridge Highway without having to drive in reverse.

The Defendant testified that co-defendant Lawson, whom the Defendant assumed had the Bobcat's keys, left to retrieve the machine and bring it to them. The Defendant noted that a neighboring business had "high brush and trees," which impeded his view of Southern Grounds from the Masonic lodge parking lot. The Defendant heard the Bobcat's engine start and joked with co-defendant Hammontree about the condition of the engine due to its being "extraodinar[ily] loud." After a short time, the Defendant saw the Bobcat come around a bend on the Masonic lodge's driveway. When co-defendant Lawson was two-thirds of the way to the truck, the Defendant saw Mr. McNeal running behind the Bobcat and waving. The Defendant thought that Mr. McNeal was "just waving at" the men in greeting, and the Defendant waved back. He noted that he had not met Mr. Lawson previously and believed that Mr. McNeal could have been Mr. Lawson. The Defendant averred that he could not hear any voices.

The Defendant testified that as Mr. McNeal came closer, he observed that Mr. McNeal was "not in a happy mood" and was "motioning [for them] to stop." The Defendant also described Mr. McNeal as "hysterical" and "demanding" that co-defendant Lawson stop the Bobcat. Co-defendant Lawson drove the Bobcat onto the trailer. The Defendant stated that he did not understand why Mr. McNeal wanted co-defendant Lawson to stop the Bobcat because according to the Defendant's understanding, co-defendant Lawson had an ownership interest in the machine. The Defendant eventually gleaned that co-defendant Lawson was not supposed to be operating the Bobcat.

The Defendant testified that upon learning this information, he cursed and stated that "this [was] a bunch of bull cr-p." The Defendant said that he pointed at co-defendant Lawson and demanded that he back the Bobcat off the trailer. The Defendant stated that after the Bobcat was unloaded, he turned toward Mr. McNeal to address him. Meanwhile, co-defendant Hammontree put away the ramps to the trailer because Mr. McNeal was "making it plain and simple" that co-defendant Lawson was not authorized to use the equipment.

The Defendant testified that co-defendant Lawson dismounted the Bobcat and entered the truck. The Defendant asserted that he was concerned that co-defendant Lawson would "take off" in the truck, and the Defendant "holler[ed] at him" in an attempt to ascertain what co-defendant Lawson was doing. Co-defendant Lawson did not respond, and the Defendant entered the truck and questioned co-defendant Lawson. The Defendant

stated that co-defendant Lawson drove the truck away and that co-defendant Lawson did not respond to the Defendant's questions.

The Defendant testified that he was unaware that the police were following the truck until co-defendant Lawson turned onto another road. The Defendant stated that after turning, co-defendant Lawson accelerated; however, the Defendant noted that he did not "get up to a dangerous speed" because they entered a subdivision. The Defendant stated that when it became apparent that the police were trying to stop the truck, he became angry and demanded that co-defendant Lawson answer his questions. According to the Defendant, co-defendant Lawson held the steering wheel "real hard" and "avoid[ed]" the Defendant. The Defendant described co-defendant Lawson's affect as being "in his own world. He [did not] even know [the Defendant] exist[ed] in the vehicle."

The Defendant testified that upon entering the cul-de-sac, co-defendant Lawson drove between two houses, and the truck crashed. The Defendant was not wearing a seatbelt, and the impact threw him about such that he became "dazed." The Defendant stated that co-defendant Lawson began "going wild" and "slapping at the door handle" in an effort to leave the truck. Co-defendant Hammontree, who was sitting in the passenger seat, opened his door, and co-defendant Lawson climbed over the Defendant to exit through the passenger-side door after "clawing and matting, and . . . beating at" the other two men. The Defendant stated that after co-defendant Lawson exited the truck, the Defendant exited the driver-side door. The Defendant stated that he fled behind co-defendant Lawson instead of waiting for the police to arrive because he was afraid.

The Defendant identified co-defendants Lawson and Hammontree in still photographs taken from the police body camera footage; he stated that co-defendant Lawson wore brown khaki pants and "a dark hoodie of some sort," whereas co-defendant Hammontree wore a hat and a grey hooded sweatshirt he had borrowed from the Defendant.

The Defendant testified that if co-defendant Lawson had communicated his intent to steal a Bobcat from Southern Grounds, the Defendant would have "looked at him like he was crazy and asked him what for, why would he do something like that." The Defendant reiterated his assumption that co-defendant Lawson owned the Bobcat, and the Defendant denied intending to steal it. The Defendant also denied seeing co-defendant Lawson break the wooden fence as he left the Southern Grounds lot.

On cross-examination, the Defendant testified that he had never worked for Southern Grounds. The Defendant stated that co-defendant Lawson "made it clear" that the Southern Grounds and Masonic lodge properties "joined together on the back side." The Defendant acknowledged that a chain-link fence was visible in a photographic exhibit taken by police, which showed the Bobcat in the Masonic lodge parking lot from a location

on the Southern Grounds lot; the Defendant noted that a streetlight in the Masonic lodge parking lot illuminated the fence in the photograph.[6] The Defendant maintained that he did not hear a crash when the Bobcat drove through the wooden fence because the Bobcat's engine was very loud. The Defendant denied seeing the Bobcat damage the lawn between the properties, and he disagreed that if he had seen the Bobcat's driving over the lawn, it would have made him suspicious.

The Defendant acknowledged that the police body camera footage showed his being led out of the woodline by police. The Defendant further acknowledged Mr. Lawson's testimony that the lost surveillance recording showed a man who was not co-defendant Lawson on the Southern Grounds lot. The Defendant characterized his demeanor toward Mr. McNeal as upset rather than aggressive, and he denied that he yelled or cursed at Mr. McNeal. The Defendant averred that he only cursed when "talking about as far as operation of the equipment." The Defendant stated that co-defendant Lawson entered the truck first, the Defendant followed, and co-defendant Hammontree entered last. The Defendant identified the person Mr. McNeal saw placing the ramp in the truck as co-defendant Hammontree.

The Defendant testified that he helped load the Bobcat onto the trailer by ensuring it was properly directed. The Defendant denied that he attempted to divert Mr. McNeal's attention, instead characterizing his stepping off the trailer as "simply getting out of the way of the machine."

When asked whether co-defendant Lawson's flight from the truck in Mr. Wright's yard reflected guilty knowledge, the Defendant responded generally that co-defendant Lawson drove the truck safely. The Defendant acknowledged, however, that the manner in which co-defendant Lawson drove after the police began to follow them "definitely began to look" as though co-defendant Lawson knew he had done something illegal. The Defendant denied that he drove the truck at any point in the evening. The Defendant acknowledged that he did not call the police at any point during the incident[7] or wait for the police to arrive.

The Defendant acknowledged that he had eight previous convictions for driving under the influence (DUI); he stated that he was a recovering alcoholic and had been sober

---

[6] Mr. Lawson noted during his testimony that for the benefit of the neighboring businesses, Southern Grounds had a wooden fence in the portions of the lot that were visible from the street.

[7] The Defendant made a comment during his testimony indicating that he may not have possessed a cell phone.

for about eight years.[8] He further acknowledged a 2018 conviction for driving with a suspended license.

The Defendant testified that he did not see the damage the truck caused to Mr. Wright's lawn, although he "assum[ed]" that photographs showing damage to the lawn were caused by the truck. He agreed that he decided to follow co-defendant Lawson and "crouch down in the woods in all those briars" rather than wait for the police. The Defendant reiterated that he wanted co-defendant Lawson to answer his questions.

The Defendant averred that he did not exit the woodline as directed by the police because he was praying and that when he stood up, he saw officers coming toward him and heard their order to come out. The Defendant denied that he resisted the officers or that they had to "come and get [him] out."

When asked why he went to Southern Grounds at night, the Defendant responded that it had "gotten dark on [them] after work" and that they encountered trouble obtaining a trailer; he denied that the timing was intentional. The Defendant stated that they chose to pick up the Bobcat on a Friday in order to facilitate weekend work without interfering with Southern Grounds's or the Defendant's regular work.

Asa Hobbs testified on the Defendant's behalf that he had previously owned a business performing "equipment work and body shop" work. Mr. Hobbs testified that he had worked in "the equipment business" with his father beginning in childhood and that he had traded in landscaping equipment his "whole life."

Mr. Hobbs met the Defendant through a friend "many" years previously, and Mr. Hobbs had known co-defendant Lawson for six or seven years. Mr. Hobbs noted that he met co-defendant Lawson when Mr. Hobbs purchased a number of lawn mowers from him.

Mr. Hobbs testified that in late January or early February of 2018, he, co-defendant Lawson, and the Defendant "made arrangements" to borrow the Bobcat from Southern Grounds. To Mr. Hobbs's knowledge, co-defendant Lawson was "the manager of [Southern Grounds] or involved with his brother, family, as a co-owner, owner, or something of it." Mr. Hobbs stated that when he periodically met co-defendant Lawson during the workday, co-defendant Lawson was with several men performing "big mowing contracts."

---

[8] The record reflects that the Defendant's three most recent DUI convictions related to offenses that occurred in 2008.

Mr. Hobbs testified that according to his agreement with co-defendant Lawson, Mr. Hobbs would perform some "trenching for him for a side job that he had to do installing an irrigation system." In exchange, co-defendant Lawson was going to clear one piece of property for Mr. Hobbs and a second piece of property for the Defendant using "an old machine[.]" To Mr. Hobbs's understanding, they were going to wait to collect the machine until the Friday before a weekend in which the Bobcat would not be needed at Southern Grounds. Co-defendant Lawson also told Mr. Hobbs and the Defendant that the Bobcat was "in ill-repair" and that co-defendant Lawson needed to operate it. Mr. Hobbs ultimately did not accompany the men to Southern Grounds on the night of the incident because his trailer was unavailable.

On cross-examination, Mr. Hobbs testified that he was previously placed on probation for driving with a suspended license, although he did not recall an October 8, 2018 violation of that probation. He acknowledged that he failed to appear in court on June 25, 2018, but he did not recall whether it resulted in a conviction. Mr. Hobbs agreed that his record reflected a failure to appear on May 12, 2017, but he denied ever having "had a felony" in relation to the failure to appear. He stated that he was charged with reckless endangerment on July 8, 2012, after firing a shotgun into the air on the Fourth of July, but that the charge was dismissed.

Mr. Hobbs testified that he sold his commercial property fifteen years before the Defendant's trial and that before the sale, he operated a body shop for twenty-five years. Although Mr. Hobbs denied knowing the meaning of the term "chop shop," he also denied that his business was a chop shop or that he was ever involved with such a business. Mr. Hobbs averred that he repaired, painted, and cleaned cars for insurance companies. He denied ever working for or owning a junk yard in the Rocky Hill area; he noted, though, that his father-in-law owned a junk yard in West Knoxville. At this juncture, the trial court interjected:

THE COURT: And what was your father-in-law's name?

THE WITNESS: Roy Clark.

THE COURT: Roy Lee Clark?

THE WITNESS: Uh-huh.

THE COURT: Go ahead.

The Defendant subsequently rested.

In rebuttal, the State called court officer James Humphrey[9] to the stand. The following exchange occurred:

THE COURT: Mr. Humphrey raise your right hand, please, and be sworn.

(Whereupon, the witness was sworn.)

THE COURT: All right. I need to have a jury out hearing before I do this.

After the jury-out hearing, which we recount in more detail below, the trial court issued the following instruction to the jury:

[Y]ou saw Mr. Humphrey called to the witness stand as a potential witness before we took a break. He is not going to be testifying.

I don't want you to speculate about why. The long and short of it is, he is one of the [c]ourt's bailiffs and officers, and he has been in charge of keeping you safe and comfortable, so he will not be testifying in this case.

Sometimes from time to time in a lawsuit . . . things just happen.

And today is one of those things that's happened. There's another witness who will be testifying. That witness is not available today.

The trial court continued to discuss scheduling matters, and court was adjourned for the day shortly thereafter.

The following morning, Knox County Sheriff's Chief Deputy Bernie Lyon testified in rebuttal that he began working in law enforcement in 1979, that he was familiar with Mr. Hobbs, and that Mr. Hobbs had a "bad reputation" in regard to truthfulness. On cross-examination, Chief Deputy Lyon agreed that his assessment of Mr. Hobbs's reputation was based upon conduct occurring in the 1990s.

Next, Knox County Sheriff's Officer Brian Bates testified that he previously worked for the Knoxville Police Department for thirty-six years and that in his opinion, Mr. Hobbs was "an untruthful person . . . involved in criminal activity." The trial court instructed the jury to disregard the comment about criminal activity and that it could only consider evidence of Mr. Hobbs's reputation for truthfulness.

---

[9] For consistency, we will refer to the court officers in the same manner as the trial court, which used the title "Mr." instead of "Officer."

In addition, Knox County Sheriff's Captain David Amburn was asked for his "opinion" of Mr. Hobbs's "reputation." Captain Amburn replied that he had worked in law enforcement for twenty-eight years and that he would not "deem [Mr. Hobbs] as a credible witness."

After the close of rebuttal evidence, the State argued in closing that the Defendant was guilty under a theory of criminal responsibility. In relevant part, the Defendant argued that he made a mistake of fact regarding co-defendant Lawson's authority to borrow the Bobcat and that consequently, he lacked the requisite mental state to commit theft. Defense counsel briefly mentioned Mr. Hobbs's corroboration of the work trade arrangement and the Defendant's mistaken impression of co-defendant Lawson, as well as the State's attempt to discredit Mr. Hobbs, but Mr. Hobbs was not otherwise discussed.

The jury instructions provided that Count 1 referred to the theft of the Bobcat by obtaining it; Count 2 was based upon an alternate theory of theft by exercising control over the Bobcat; Count 3, vandalism, was based upon the damage to Southern Grounds's fence; Count 4, vandalism, was based upon the damage to Mr. Wright's yard; Count 5, evading arrest, was based upon the Defendant's flight into the woodline after the truck crashed; and Count 6, driving with a revoked license, was based upon the Defendant's driving the truck. The jury was instructed on criminal responsibility, as well as facilitation of theft as a lesser-included offense.

Upon this evidence, the Defendant was convicted of evading arrest, the vandalism of Mr. Wright's yard, driving with a revoked license, and the lesser-included offense of facilitation of theft of property valued at "more than" $2,500[10] but less than $10,000 by exercising control over the Bobcat. The jury acquitted the Defendant of Count 1, theft of property valued at $10,000 or more but less than $60,000, and Count 3, vandalism related to Mr. Wright's yard. After a sentencing hearing, the trial court found that the Defendant was a career offender and imposed concurrent sentences of six years for facilitation of theft and eleven months, twenty-nine days each for evading arrest, vandalism, and driving with a revoked license, second offense.

Relevant to this appeal, in the Defendant's motion for a new trial, he argued that the trial court erred by (1) permitting evidence of Mr. Clark's familial relationship to Mr. Hobbs; (2) allowing the State to cross-examine Mr. Hobbs regarding uncharged conduct "dating back to the 1970s" when the conduct was irrelevant to the Defendant's case and Mr. Hobbs's credibility; (3) denying a motion for a mistrial relative to Mr. Humphrey's

---

[10] The theft grading statute provides that theft of property valued at $2,500 or more but less than $10,000 is a Class D felony. Regardless of the inaccuracy of the verdict form's using the phrase "more than" $2,500, the jury's finding regarding the value in Count 2 was clearly within the Class D range for theft and, by extension, the Class E range for facilitation of theft. Tenn. Code Ann. §§ 39-11-403(b), -14-105.

having been sworn as a witness; and (4) allowing rebuttal testimony from three Knox County Sheriff's officers, given that their testimony was not indicative of Mr. Hobbs's "current reputation or character for truthfulness but instead . . . [was] based on involvement with him dating back to the 1970s through the 1990s." The Defendant also noted that "[t]he relief requested in this motion [was] necessary to protect [his] rights to due process and a fair trial[.]"

The Defendant also filed a motion requesting a hearing to determine the extent of Mr. Humphrey's contact with the jury. At a joint hearing in which the court considered both motions, the court found that although Mr. Humphrey had "intimate" contact with the jury, a mistrial was unnecessary because he did not ultimately testify. The court did not orally address the other issues in the motion for a new trial, and its subsequent written order denying the motion contained no findings of fact. The Defendant timely appealed.

ANALYSIS

## I.      Mistrial

The Defendant contends that the trial court erred by denying his motions for a mistrial based upon Mr. Humphrey's having been sworn as a witness and the court's having elicited Mr. Clark's full name. Because the Defendant raises two issues regarding the denial of a motion for a mistrial, for the sake of efficiency, we will consider both issues at once.

### a. Applicable Law

The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). For a mistrial to be declared, there must be a "manifest necessity" that requires such action. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004); State v. Millbrooks, 819 S.W.2d 441,443 (Tenn. Crim. App. 1991). A mistrial is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000); see State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court

gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

### b. Court Officer's Testimony

The Defendant contends that the trial court abused its discretion by denying his motion for a mistrial after Mr. Humphrey was sworn as a witness, arguing that although Mr. Humphrey ultimately did not testify, the jury could reasonably have concluded that Mr. Humphrey would have testified to the same facts as the three subsequent law enforcement witnesses. The Defendant further argues that the trial court's curative instruction emphasized a connection between Mr. Humphrey's anticipated testimony and that of the police witnesses; in particular, at oral argument, appellate counsel highlighted that the jury was instructed not to speculate as to why Mr. Humphrey did not testify but not about what he would have testified. The Defendant avers that as a result of the State's actions, a message was sent to the jury that the court system itself "c[a]me down" on the side of the State.

The Defendant further notes that in light of his defense theory of a mistake of fact, his defense "rose or fell" on Mr. Hobbs's credibility. The Defendant argues that the import of Mr. Hobbs's credibility and the degree of prejudice inuring to him were evidenced by the "extraordinary lengths" to which the State went to discredit Mr. Hobbs.

The State responds that no error occurred because Mr. Humphrey did not testify and that the jury, which was presumed to have followed the court's instructions, was generally instructed not to speculate about the reasons for evidentiary rulings.

### i. Procedural Facts

After Mr. Humphrey had been sworn as a witness, the court excused the jury and questioned Mr. Humphrey as follows:

> [THE COURT]: All right. What have you done with this jury so far, Mr. Humphrey? Have you been personally waiting on them? You took the oath on Monday to wait on this jury, correct?
>
> MR. HUMPHREY: Yes.
>
> THE COURT: What have you done with this particular jury, not in general, but this particular jury?

-13-

MR. HUMPHREY:  I escorted one up for a smoke break earlier today.  I contacted by phone regarding what time to report today, five of them.  Four, one left.[11]

The trial court asked the State if another rebuttal witness could be presented.  The State responded that although numerous witnesses could be called, Mr. Humphrey and court officer Mark Pressley were present, and only Mr. Humphrey had engaged in prior direct contact with Mr. Hobbs.  The Defendant argued that a danger existed that the jury would give Mr. Humphrey's testimony "extra weight" due to his having had direct contact with the jurors.  The State suggested a curative instruction, and the court noted that if Mr. Humphrey or Mr. Pressley testified, they could not be allowed to "wait on" the jury further.  After the court asked Mr. Humphrey if he could name any officers who would know of Mr. Hobbs, the court called a recess and commented,

We are opening up a dangerous can of worms right here, General.  If . . . Mr. Humphrey was a court officer who just merely had been in this courtroom, that's one question.  But he has had specific and individualized contact with members of this very jury that's trying this case and now we're asking him to testify as a witness.

Quite frankly, it's a situation I don't recall in 30 years of doing this[.]

The State conducted a proffer during the jury's absence in which Mr. Humphrey testified that he became aware of Mr. Hobbs during his tenure as a patrol officer in the late 1970s.  He stated that the "burglary larceny detectives and auto theft detectives" told the patrol officers to be alert "at construction sites, car lots, shopping centers, and they specifically named [Mr. Hobbs], among others, for stealing cars or stealing construction equipment."  Mr. Humphrey averred that everyone he knew who "had anything to do with" Mr. Hobbs told Mr. Humphrey not to believe anything Mr. Hobbs said.  The trial court asked Mr. Pressley, who was also present in the courtroom, if his testimony would be identical, and Mr. Pressley nodded affirmatively.

After the recess and before the jury returned to the courtroom, the trial court concluded that Mr. Humphrey could not testify and that the State would have to call another law enforcement witness.  The prosecutor replied that only the three court officers recalled the facts to which Mr. Humphrey had testified.  The court stated that the State was "not going to call one of these bailiffs" and that they would "try this case again if you do."  The prosecutor noted that the bailiffs' oath involved not discussing the case with the jury.  The

---

[11] The trial transcript reflects that after the trial began, one juror was excused to attend to a hospitalized child.

court again asked the prosecutor if she could find another police witness "who [knew] about Roy Lee Clark and Mr. Hobbs."

Defense counsel argued that the reputation evidence Mr. Humphrey had offered was from the 1970s and therefore, it was irrelevant and not the type of evidence contemplated by Tennessee Rule of Evidence 608(a). The court found that the evidence had been "made relevant in large part by Mr. Hobbs' testimony about what he's done for a living for . . . many years. His reputation for truthfulness is at issue." The court concluded that the evidence was admissible, "but it's not going to be from one of [the court's] bailiffs."

The trial court then questioned Mr. Pressley briefly about his contact with the jury; Mr. Pressley responded that other than seeing the jurors in the hallway, he had not directly interacted with them. The court found that because Mr. Pressley had taken the same oath as Mr. Humphrey, it was "much cleaner" to have another officer testify. After more discussion, it was decided that the proceedings would be adjourned until the following morning[12] in order for the State to obtain other witnesses.

The following morning, defense counsel noted her concern that the jury would realize that Mr. Humphrey would have testified to the same facts as the police witnesses who were set to testify that day. Counsel argued that because of the relationship and rapport between the jurors and Mr. Humphrey, a mistrial was necessary. The trial court stated for the record that although Mr. Humphrey was called to the stand and sworn in, the court's "wheels were already turning that [it was] not going to do this." The court admonished the parties that in the future, if a party intended to call a court officer as a witness, it should approach the bench in advance of doing such. The court found that it had given a curative instruction, that Mr. Humphrey was not permitted to offer any testimony, and that it was willing to give an additional curative instruction, although in the court's opinion, further instruction would draw undue attention to the issue. The court denied the Defendant's request for a mistrial.

After trial, the Defendant filed a motion requesting the court to make findings of fact regarding the extent of Mr. Humphrey's contact with the jury. At the motion for a new trial hearing, Mr. Humphrey testified that he did not recall his interactions with this particular jury but that he did not believe he deviated from his customary practices. Mr. Humphrey stated that his oath with respect to the jury was administered in front of the jurors. He said that generally, jurors checked in at the clerk's office in the courthouse and that when the trial court was ready for the jury, Mr. Humphrey escorted them to the courtroom, explained who he was, and "explain[ed] the process." Mr. Humphrey agreed that he sometimes "wait[ed] around" in the same room as the jurors until the trial court was

---

[12] The transcript reflects that this discussion occurred at about 3:00 p.m.

ready for them.   Mr. Humphrey also sat in the courtroom beside the jury box during jury selection and trial, collected badges of dismissed potential jurors, and gave them directions about how to leave the courthouse.   Once a jury was seated, Mr. Humphrey escorted them to and from the jury room and instructed them to leave their notebooks in the courtroom until deliberations began.   Mr. Humphrey and a second court officer took turns escorting any smokers to a designated outdoor area.   Mr. Humphrey noted that a line was painted near the door indicating that smokers should stand beyond it.   Mr. Humphrey averred that he stood inside the painted line while the smokers stood some distance away and that he did not converse with them.   Mr. Humphrey also escorted jurors from the jury room to pick up their lunches in another room of the courthouse, after which the jurors returned to the jury room; if a juror wanted more food, Mr. Humphrey or another officer would escort the juror to the lunch room to retrieve a second helping.   At the end of the day, Mr. Humphrey escorted the jury out of the jury area and told them where to report the following morning.   Mr. Humphrey denied conversing with jurors while escorting them from place to place.

Mr. Humphrey recalled that a one-hour snow delay occurred during the Defendant's trial and that he and two other court officers called the jurors regarding the time they should report to the courthouse.   Mr. Humphrey personally called five or six jurors.   Mr. Humphrey stated that after he was called as a witness, he had no further contact with the jury by instruction of the trial court and that he sat in the rear of the courtroom by the door.

The trial court noted for the record that at the time Mr. Humphrey was called as a witness, he was already sitting in the rear of the courtroom.   When asked whether he was the "primary person" who told the jury where to go in the courthouse, Mr. Humphrey responded, "For a short time," and he noted that he and another officer "shared responsibility" for the jury.

Mr. Humphrey testified that during the trial, Mr. Pressley asked if Mr. Humphrey remembered Mr. Hobbs.   When Mr. Humphrey responded affirmatively, Mr. Pressley relayed that fact to the prosecutor, who spoke to Mr. Humphrey further.   On cross-examination, Mr. Humphrey reiterated that he did not converse with any of the jurors, and denied having discussed the facts of the Defendant's case with any juror or eating with the jurors.   He affirmed that the jury was not sequestered.

The Defendant argued that because Mr. Humphrey was called as a witness, the State converted a neutral representative of the court to whom the jurors looked for "protection and advice and instruction" into an "arm of the prosecutor," and that although Mr. Humphrey did not testify, when the three law enforcement witnesses testified, "any juror who was half awake during the trial . . . could have deduced that's exactly what Mr. Humphrey would have said[.]"   The State responded that a distinction existed between

calling a court officer as part of the prosecution's main case as opposed to a rebuttal witness and that Mr. Humphrey never testified.

The trial court made the following oral findings of fact:

I have given this a lot of thought. Mr. Humphrey was intimately connected with the jury in this case, had contact with them, and as he was coming up to the stand, I knew that there was a potential problem already in the making. That's why the [c]ourt sent the jury out once the [c]ourt confirmed that Mr. Humphrey, in fact, had waited on the jury.

I think the fact that the [c]ourt did not allow Mr. Humphrey to testify to the facts that he was being called to testify about, in this [c]ourt's mind, will justify not granting a new trial in this case.

### ii. *Analysis*

In support of his argument, the Defendant cites Turner v. Louisiana, 379 U.S. 466 (1965), in which the United States Supreme Court held that a due process violation occurred when the state's primary witnesses were two court deputies who also served as the custodians of a sequestered jury. In Turner, Officer Vincent Rispone[13] testified in detail regarding his investigation of the crime scene, his role in arresting the defendant, and the defendant's leading him to the location of the cartridge clip from the murder weapon. Id. at 467. Likewise, Officer Hulon Simmons testified and corroborated Officer Rispone's account of the defendant's arrest and the location of the cartridge clip; Officer Simmons also detailed "damaging admissions" the defendant made at the time of his arrest and the circumstances under which Officer Simmons "prevailed upon" the defendant to make a written confession. Id. In compliance with then-effective Louisiana law, the jury was sequestered during the three-day trial and "placed in charge of the Sheriff" by the trial court. Id. at 468. "In practice, this meant that the jurors were continuously in the company of deputy sheriffs" during the trial, and the officers "drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." Id.

When Officers Rispone and Simmons were respectively called to testify, the defendant moved for a mistrial, which was denied; during jury-out hearings on the motions, it was "established that both Rispone and Simmons had in fact freely mingled and conversed with the jurors in and out of the courthouse during the trial." Turner, 379 U.S.

---

[13] The Supreme Court did not use a title when referring to the court officers in this case. Because they were also active duty police officers who investigated the case, we will refer to them using the title "Officer."

at 547. Specifically, Officer Rispone testified that he had spoken to the jurors in carrying out his duties. Id. at n.6. Officer Simmons also acknowledged having spoken to the jurors, and he noted that he knew some of the jurors and made the acquaintance of others during the trial. Id. Officer Simmons stated that he ate two meals with the jurors at the same table and that he rode in a car with them to and from the restaurant. Id. Officer Simmons denied discussing the case with the jurors at any time. Id. Officer Simmons further agreed that he was the "Chief Criminal Deputy" in charge of officers supervising the jury and handled certain tasks with the jury personally. Id. The trial court denied the motion for a mistrial because Officers Rispone and Simmons did not discuss the case with the jurors; Officers Rispone and Simmons continued to serve as jury custodians. Id. at 469-70.

On appeal, the United States Supreme Court held that this sequence of events "operated to subvert [the] basic guarantees of trial by jury" because it created the possibility that the jury would base its verdict upon information outside of the evidence presented at trial. Turner, 379 U.S. at 472-73. The Court continued,

> It is to be emphasized that the testimony of Vincent Rispone and Hulon Simmons was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether Wayne Turner was to be sent to his death. To be sure, their credibility was assailed by Turner's counsel through cross-examination in open court. But the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality.

Id. at 473. The Court noted that although the officers denied having discussed the case with the jurors, "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." Id. The Court emphasized that the contact between the officers and the jury was not "a brief encounter, but . . . a continuous and intimate association throughout a three-day trial—an association which gave these witnesses an opportunity, as Simmons put it, to renew old friendships and make new acquaintances among the members of the jury." Id. The Court noted that the officers' professional position "could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial" and that the defendant's fate turned on the whether the jury found Officers Simmons and Rispone to be credible. Id. at 474. As a result, the Court reversed the defendant's conviction and remanded the case for a new trial. Id.

Subsequently, in Gonzales v. Beto, the Supreme Court applied Turner and summarily ordered a new trial when an officer who was the jury's custodian testified for the State to authenticate the defendant's confession, which was dictated to the police and signed with an "X," regarding a murder that occurred five years before the defendant's arrest. 405 U.S. 1052-53 (1972) (Stewart, J., concurring). During the one-day trial, the officer escorted the jurors to and from the courtroom, accompanied them to lunch and ate with them in a private room, and provided them with drinks during deliberations. Id. Justice Stewart noted that "[o]nce, the judge even asked [the officer] to step down from the witness stand, where he was undergoing cross-examination, in order to retire the jury." Id. at 1053. Justice Stewart concluded that although Turner did not create a per se rule that a new trial was required every time the jury came into contact with a prosecution witness,

> [o]ur adversary system of criminal justice demands that the respective roles of prosecution and defense and the neutral role of the court be kept separate and distinct in a criminal trial. When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted.

Id. at 1055-56. As a result, even if the officer's contact with the jury was not as "intense" as the officers in Turner, the contacts were not de minimis. Id. at 1056.

The Defendant correctly observes that Tennessee's courts have only had occasion to consider Turner once. See State v. Michael Lynn Stanton, No. E2003-02675-CCA-R3-CD, 2005 WL 876873 (Tenn. Crim. App. Apr. 15, 2005). In Stanton, the State's evidence established that the defendant broke into his former wife's home when she denied him entry and shot her in the shoulder; her boyfriend was also present and shot the defendant. Subsequently, the former wife's stepfather arrived, and it was alleged that the defendant shot and killed him. Id. at *2-3. The defendant presented the testimony of his treating surgeon, who opined that it was "unlikely" the defendant could have accurately fired a gun within five minutes of having been shot himself. Id. at *6. In rebuttal, the State called court officer Lieutenant James Carson, who had personal experience with suffering a gunshot wound. Id. at *14. The trial court asked counsel to approach the bench, excused the jury, and heard argument from the parties regarding the admissibility of Lieutenant Carson's proposed testimony, after which the court found that Lieutenant Carson had been in "charge of the jury for several days." As a result, the court concluded that the potential prejudice of the testimony outweighed its probative value and excluded it pursuant to Tennessee Rule of Evidence 403. Id.

In the trial court's consideration of the motion for a new trial, it clarified that Lieutenant Carson was "one of the supervisors of the court officers but [was] not over the jury"; that Lieutenant Carson "did some transportation and . . . supervised the others" but did not stay with the jurors, spend the night with them, or eat with them; and that Lieutenant Carson "had no direct discussion contact with the jurors." Stanton, 2005 WL 876873, at *15. The court concluded that the aborted attempt to call Lieutenant Carson as a witness had no effect on the jury. Id.

On appeal, the defendant argued that the trial court should have declared a mistrial because Lieutenant Carson's "mere presence on the witness stand was prejudicial[.]" Stanton, 2005 WL 876873, at *14. This court noted that no request for a mistrial was made and that the issue consequently had been waived; however, this court briefly considered the merits of the issue and concluded that no error occurred. Id. This court discussed the facts in Turner and distinguished it from Stanton, noting that as soon as the State "announced its intention" to call Lieutenant Carson as a witness, the trial court held a jury-out hearing in which Lieutenant Carson averred that he had not discussed his proposed testimony with the jurors; that Lieutenant Carson did not, in fact, testify; and that after Lieutenant Carson's testimony was excluded, the State rested. Id. at *15. This court observed that in Turner, the court officers not only testified, but offered evidence that "must inevitably have determined" the defendant's fate. Id.

In this case, the Defendant urges this court to conclude that his case is more similar to Turner and Gonzales than Stanton because, he argues, the existence of the subsequent police witnesses allowed the jury to surmise what Mr. Humphrey's character testimony would have been. To be clear, we agree with the trial court's admonition to the parties that any attempt to present evidence from a court officer should be preceded by a request for a bench conference or jury-out hearing instead of simply calling the officer as a witness. The procedure in this case was unadvisable, and Mr. Humphrey's having been called and sworn as a witness was error. However, we do not discern that the trial court abused its discretion by denying the motion for a mistrial.

We agree with the trial court's assessment that Mr. Humphrey's contact with the jury was sufficiently intimate to preclude his testifying; his contacts with the jury were akin to the officer in Gonzalez and were not de minimis. Mr. Humphrey testified that he escorted one juror outside for a "smoke break"; he personally contacted four jurors during snow-delay phone calls; he also generally escorted jurors to and from the jury room and to pick up their lunches. Although he averred that he did not converse with jurors at any time, Mr. Humphrey was positioned as a representative of the court, and it was inappropriate for him to testify on behalf of the State.

-20-

Further, we disagree with the State's assertion that Mr. Humphrey's testimony would not have been constitutionally problematic because it was offered in rebuttal rather than part of the State's case in chief. The defense theory relied upon Mr. Hobbs's corroboration of the Defendant's mistake of fact and the work trade arrangement, and as a result, evidence bearing on Mr. Hobbs's credibility was not "an uncontroverted or merely formal aspect" of the prosecution, but directly related to the issue of the Defendant's guilt.

However, the Defendant's case is distinguishable from Turner and Gonzalez in that Mr. Humphrey did not testify. We cannot conclude that Mr. Humphrey's having been sworn as a witness is sufficient to trigger an implication of bias based upon his custodial relationship with the jury. Stanton, 2005 WL 876873, at *15; see Cutts v. Smith, 630 Fed.Appx 505, 509 (6th Cir. 2015) (discussing that the Supreme Court has "implied bias . . . [in] cases involving extreme circumstances" such as those in Turner). Because Mr. Humphrey's testimony did not come to fruition, the due process concerns addressed in Turner are not implicated here.

Relative to the Defendant's concern about the subsequent officers' testimony's being imputed to Mr. Humphrey, we note that Mr. Humphrey was excused mid-afternoon, that court was adjourned for the day afterward, and that the other officers testified the following morning. This temporal break served to distance Mr. Humphrey from the subsequent testimony. Further, we disagree with the Defendant that the trial court's curative instruction necessarily connected Mr. Humphrey to the other officers' testimony. The court stated that Mr. Humphrey would not be testifying, that a witness was occasionally excluded during a trial, and that the jury should not speculate as to the reason for his exclusion. The court also proceeded to disclose the reason for Mr. Humphrey's exclusion—that he was in charge of keeping the jury "safe and comfortable." The court continued to state, "Sometimes from time to time in a lawsuit . . . things just happen. And today is one of those things that's happened. There's another witness who will be testifying. That witness is not available today." We note that the court did not say that another witness would be testifying in Mr. Humphrey's stead; however, we acknowledge that the jury was made aware that Mr. Humphrey would have testified for the State but for his role as jury custodian. Although the procedure in this case was far from ideal and under other circumstances could lead to the impermissible imputation of testimony the Defendant alleges, under these particular facts, there was no reason other than speculation to presume that the jury would impute the police witnesses' testimony to Mr. Humphrey. Accord Stanton, 2005 WL 876873, at *15

Relative to the motion for a mistrial, although the State created the situation at issue, the jury heard no impermissible testimony; the trial court issued a curative instruction, which we have concluded made no untoward inference regarding the subsequent testimony; and the State's evidence was strong. We cannot conclude that the trial court

abused its discretion by denying the motion for a mistrial. The Defendant is not entitled to relief on this basis.

### c. Roy Lee Clark

The Defendant contends that the trial court erred by denying his motion for a mistrial after the court elicited from Mr. Hobbs that his father-in-law was Roy Lee Clark. The Defendant argues that Mr. Clark was known in Knox County as the operator of a chop shop and the subject of a murder case, facts which were irrelevant to the Defendant's case but which served to imply that Mr. Hobbs engaged in similar criminal dealings. The State responds that the Defendant is not entitled to relief because he has not proven that any prejudice inured to him or that any jurors knew of Mr. Clark's reputation.

### i. Procedural Facts

As recounted in more detail below, during the jury-out hearing regarding the scope of the State's cross-examination of Mr. Hobbs, it was discussed that Mr. Hobbs's father-in-law was Roy Lee Clark. Mr. Hobbs answered questions about the extent of his involvement in Mr. Clark's court case and generally denied having participated in Mr. Clark's chop shop operation. After initially excluding questions regarding the chop shop due to the age of the alleged events, the trial court permitted the State to question Mr. Hobbs in front of the jury about whether he had ever been involved in a chop shop after Mr. Hobbs testified that he had worked with equipment for his entire life and had owned a body shop for many years. In response to the prosecutor's asking if he had ever owned a junk yard, Mr. Hobbs replied negatively, but added that his father-in-law had owned one. The trial court interjected and asked Mr. Hobbs for his father-in-law's name. Mr. Hobbs replied, "Roy Clark." The trial court responded, "Roy Lee Clark?" Mr. Hobbs answered affirmatively, and the topic was not discussed further.

The morning after Mr. Hobbs testified and before the State's rebuttal commenced, defense counsel requested a mistrial based upon the court's eliciting Mr. Clark's full name, noting that although she was not previously familiar with Mr. Clark, she had researched him after Mr. Hobbs testified and came to the conclusion that "every juror on there over a certain age . . . underst[ood] that Roy Clark was apparently convicted of murder." Counsel argued that eliciting Mr. Clark's name was both irrelevant and "extremely prejudicial" given that the only connection between Mr. Clark and Mr. Hobbs was their in-law relationship.

Relevant to the mistrial issue, the trial court stated its belief that the jury was intelligent and would not "make an association that because Mr. Clark [may] have been

convicted of serious crimes . . . by implication [Mr. Hobbs] was involved in it[.]"  The court declined to declare a mistrial on this basis.

### ii.    *Analysis*

For context, the Defendant has cited in his appellate brief to United States v. Clark, 988 F.2d 1459, 1461 (6th Cir. 1993), wherein the federal Sixth Circuit Court of Appeals recounted that Mr. Clark was convicted of murdering his brother-in-law, who had served as a Federal Bureau of Investigation informant regarding Mr. Clark's stealing automobiles and operating a chop shop to sell the stolen vehicles and parts.[14]   Although the jury heard no details regarding Mr. Clark's criminal history at trial, during the relevant jury-out hearings, the trial court indicated its familiarity with Mr. Clark and noted to defense counsel that several members of the Public Defender's Office would also have been familiar with him.

We agree with the Defendant that the trial court's eliciting Mr. Clark's full name provided the jury with potentially prejudicial information that was wholly irrelevant to any fact at issue in the Defendant's trial, including Mr. Hobbs's credibility.  The murder in question occurred in 1990, and Mr. Clark was sentenced to life imprisonment; presumably, Mr. Hobbs's potential involvement with his father-in-law's illicit business terminated sometime between the time of Mr. Clark's arrest and his incarceration in federal prison. Pursuant to Tennessee Rule of Evidence 608(b) governing specific instances of conduct, the chop shop allegations would not be a proper subject for impeachment unless the trial court determined after the jury-out hearing that there existed a sufficient factual basis for the inquiry and that "in the interests of justice" the probative value of the evidence substantially outweighed its prejudicial effect.  As we discuss below, this analysis was not completed by the trial court, making the line of questioning improper due to the age of the incidents in question and the lack of any factual basis to establish that Mr. Hobbs was involved in the chop shop; in addition, there was an obvious risk of unfair prejudice from Mr. Hobbs' being connected to an ongoing criminal enterprise—one which culminated in the murder of another family member—when compared to the minimal probative value of having engaged in automobile theft and dealing in stolen car parts thirty years previously. We note that Mr. Hobbs consistently denied engaging in this behavior.

The Defendant correctly noted at oral argument that when the trial court asked Mr. Hobbs to name his father-in-law, it already knew the answer to the question.   The

---

[14] The court also noted that from its review of the record, it appeared that Mr. Clark's daughter, Celene Clark Hobbs, was also involved with the chop shop.  See Clark, 988 F.2d at 1462.   It was unclear whether Ms. Hobbs was Mr. Hobbs's wife or another relative.   However, Ms. Hobbs's involvement in the chop shop was not mentioned during the Defendant's trial.

Defendant argues that the court's action in asking for Mr. Clark's name, then supplying his full name itself, communicated to the jury that the court felt it important for the jury to know that Mr. Hobbs was connected to a notorious killer. Suffice it to say, it was error for the court to elicit this testimony.

However, this error alone was not sufficiently egregious to justify a new trial because the information was not elicited by the State, whom we note avoided the topic of Mr. Clark after the jury-out hearing; it was a passing reference in a three-day trial; neither the State nor the Defendant mentioned Mr. Clark again; it is not clear from the record that the jurors knew of Mr. Clark's reputation or were influenced by it[15]; and the State's evidence was sufficient to support the verdicts notwithstanding the improper reference to Mr. Clark. The Defendant is not entitled to relief on this basis.

## II.    Reputation/Opinion Evidence

The Defendant contends that the trial court abused its discretion by admitting evidence of Mr. Hobbs's reputation for truthfulness, arguing that the State failed to establish that the testimony was relevant to his truthfulness at the time of trial. The Defendant notes Chief Deputy Lyon's testimony that his impression of Mr. Hobbs was based upon events occurring in the 1990s and that Officer Bates was referring to events occurring when Officer Bates was eighteen years old. The Defendant argues that this type of evidence was not contemplated by Rule 608(a), even if admitted with proper foundation.

In a related issue, the Defendant also argues that the State failed to provide an adequate foundation for the reputation or opinion evidence. The Defendant avers that instead of providing general community-based reputation evidence, the "parade of law enforcement officers" primarily conveyed to the jury that the police knew of and were suspicious of Mr. Hobbs, implying that he was a "life-long crook." At oral argument, appellate counsel stated that defense counsel's discussion of the temporally distant basis for the officers' impressions of Mr. Hobbs was, in effect, an objection to foundation.

The State responds that the Defendant's issue related to foundation has been waived for failure to contemporaneously object, noting that defense counsel's discussion of the time to which the evidence was relevant occurred only during the jury-out hearing about Mr. Humphrey's testimony, which did not extend to the testimony of the three officers. In the alternative, the State argues that plain error relief is not warranted.

---

[15] The jury selection transcript indicated that two jurors referenced events occurring in the 1970s, and several mentioned events occurring in the 1990s. However, the jurors' respective ages and whether they lived in Knox County at the time of Mr. Clark's trial were not discussed.

Although the Defendant did not lodge an objection to foundation during the officers' testimony, the record reflects that before the rebuttal testimony began, defense counsel requested a jury-out hearing relative to the officers' basis of knowledge for Mr. Hobbs's reputation, which the trial court denied. Counsel noted her concern that inquiry into the officers' knowledge would open the door to evidence of Mr. Hobbs's prior bad acts, and the court reminded the State not to reference specific instances of conduct.

Our examination of the record reflects that after the jury-out offer of proof relative to Mr. Humphrey, defense counsel objected to Mr. Humphrey's reputation testimony as irrelevant because of its age. The trial court found that the evidence had been "made relevant in large part by Mr. Hobbs' testimony about what he's done for a living for . . . many years. His reputation for truthfulness is at issue." The court concluded that the evidence was admissible so long as the witness was not a court bailiff. In light of the court's ruling on this objection, defense counsel did not waive the foundation or relevance issue relative to the three subsequent law enforcement witnesses. The court had concluded that opinions based upon long-ago experience was admissible, and counsel was not required to repeat a futile objection. We will, therefore, examine this issue under plenary review.

Tennessee Rule of Evidence 608(a) provides, in relevant part, that a witness's credibility "may be attacked . . . by evidence in the form of opinion or reputation," but that the evidence "may refer only to character for . . . untruthfulness" rather than specific instances of conduct. The two types of Rule 608(a) evidence, opinion and reputation, require distinct foundations to be laid before they are admissible. Reputation evidence requires proof that the character witness has knowledge of the person under attack, the community in which the person has lived, and the "the circles in which [the person] has moved, as to speak with authority of the terms in which generally [the person] is regarded." State v. Dutton, 896 S.W.2d 114, 118 (Tenn. 1995) (quoting United States v. Watson, 669 F.2d 1374, 1381 (11th Cir. 1982) (internal citations omitted)). In contrast, our supreme court has noted that

> While "[t]he reputation witness must have sufficient acquaintance with the principal witness in his community in order to ensure that the testimony accurately reflects the community's assessment, . . . the opinion witness is not relating community feelings." United States v. Watson, 669 F.2d at 1382. Instead, the opinion witness testifies from personal knowledge and relates a personal impression of the primary witness's character for truthfulness. United States v. Watson, 669 F.2d at 1382. See also Tenn. R. Evid. 602. Therefore, to establish admissibility of opinion testimony, it is necessary to demonstrate "that the opinion is rationally based on the perception of the witness and would be helpful to the jury in determining the

-25-

fact of credibility." United States v. Dotson, 799 F.2d 189, 193 (5th Cir. 1986).

Id.  Moreover, because reputation or opinion evidence bears on the witness's credibility at the time of trial, "the reputation or opinion proof under Rule 608(a) should relate to the witness's character at the time of the proceeding."  Neil P. Cohen, et al., Tennessee Law of Evidence 6.08[3][a] (6th ed. 2011); see State v. Steven Lee Whitehead, No. W2000-01062-CCA-R3-CD, 2001 WL 1042164, at *17 (Tenn. Crim. App. Sept. 7, 2001) (quoting the same language from a previous edition of the treatise), appeal granted on other grounds and case remanded (Tenn. Mar. 4, 2002).

In this case, the three law enforcement witnesses did not provide sufficient information to lay a foundation for either reputation or opinion evidence.  Chief Deputy Lyon testified only that he began his career in "the jail" in 1979, that he had since worked in every division of the Sheriff's Office, and that he was "familiar with" Mr. Hobbs and his poor reputation for truthfulness based upon unspecified conduct occurring in the 1990s.

Likewise, Officer Bates testified that he worked for the Knoxville Police Department for thirty-two years before working for the Knox County Sheriff's Office and that he was familiar with Mr. Hobbs.  When asked whether he had "an opinion as to [Mr. Hobbs's] reputation for truthfulness," Officer Bates stated, "Well, I know early on -- when I was [eighteen] I was a reserve officer with the City, and I used to -- [.]"  After the trial court instructed Officer Bates to avoid describing specific incidents, the prosecutor asked Officer Bates whether he had "an opinion as to [Mr. Hobbs's] character" for truthfulness. Officer Bates responded, "I would -- my opinion is an untruthful person . . . involved in criminal activity."  The Defendant objected to the latter part of the statement, and the court instructed the jury to disregard Officer Bates's comment about criminal activity.  The court further instructed the jury that the Rules of Evidence "provide that a witness may offer opinion testimony in the form of reputation.  If he's familiar with [Mr. Hobbs's] reputation for truthfulness or untruthfulness, that's as far as you may consider."

Finally, Captain Amburn testified that he was a narcotics unit supervisor and that he had worked for the Knox County Sheriff's Office for twenty-eight years in a range of positions, including "a special task force" and being "attached to the narcotics unit." Captain Amburn affirmed that he was familiar with Mr. Hobbs.  When asked whether he had "an opinion as to what [Mr. Hobbs's] reputation is for truthfulness or untruthfulness," Captain Amburn responded, "I would not deem him as a credible witness, no, ma'am."

Relative to Chief Deputy Lyon, he was clearly asked about Mr. Hobbs's reputation in the community.  However, other than being a police officer, Chief Deputy Lyon did not describe the extent of his familiarity with Mr. Hobbs, nor his familiarity with the Knoxville

community as it related to Mr. Hobbs and his social circles.  He also affirmed that his knowledge of Mr. Hobbs was based upon conduct occurring between twenty and thirty years before the trial.   In short, nothing in Chief Deputy Lyon's testimony indicated that he could "speak with authority" about Mr. Hobbs's reputation for truthfulness at the time of trial.

Relative to Officer Bates and Captain Amburn, the record reflects that the language used by the prosecutor and the trial court was less than precise, repeatedly referring to the witnesses' "opinion" of Mr. Hobbs's reputation or characterizing the evidence as "opinion testimony in the form of reputation."   Clumsy phrasing aside, it is evident from the jury-out hearing regarding Mr. Humphrey that the parties anticipated that the officers would give reputation testimony, not a personal opinion.   Moreover, the court's instruction during Officer Bates's testimony indicated that the aim of the questions was to establish Mr. Hobbs's reputation in the community.

At any rate, whether we apply the foundation standard for opinion or reputation evidence, neither Officer Bates nor Captain Amburn established that they had personally interacted with Mr. Hobbs to such a degree that they could form opinions as to his character for truthfulness.   Likewise, neither Officer Bates nor Captain Amburn indicated present knowledge of Mr. Hobbs's reputation in the community.   Captain Amburn was not asked for the time frame in which his impression of Mr. Hobbs's reputation was formed, and before Officer Bates was interrupted by the trial court, he began to discuss an event occurring at the beginning of his career when he was eighteen years old, more than thirty years before the trial.   We note that familiarity with a person's reputation in the law enforcement community does not equate to familiarity with a person's reputation in the community in which the person lives; none of the three police witnesses indicated that they were familiar with Mr. Hobbs's community reputation.[16]   The admission of the reputation or opinion testimony was error.

Our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).   Id.   As relevant to this issue, our supreme court has noted that "errors in the admission of evidence do not normally take on constitutional dimensions."   Id. at 375 (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)).

In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to

_____

[16] We also note that Mr. Humphrey's proposed testimony, which provided the most detail regarding the basis for his knowledge of Mr. Hobbs, only established Mr. Hobbs's reputation among law enforcement in the 1970s, not the community in general.

demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Rodriguez, 254 S.W.3d at 372 (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id.

We conclude that this error was sufficiently egregious that it more probably than not affected the outcome of the trial. The State itself characterized Mr. Hobbs's character as "of the utmost importance," and Mr. Hobbs was the only person who could corroborate the Petitioner's mistake of fact theory. Given that the reputation/opinion evidence was admitted without sufficient foundation, its probative value was minimal when weighed against the potential for unfair prejudice. Three law enforcement officers were permitted to testify that they were familiar with Mr. Hobbs and that their impression of his credibility was poor; in fact, two of the officers indicated that their impression of Mr. Hobbs was based upon long-ago events. We note that although the jury was instructed to disregard Officer Bates's comment about Mr. Hobbs's involvement in criminal activity, this statement succinctly demonstrated the potential harm of allowing the officers to testify without providing context regarding the extent and nature of their contact with Mr. Hobbs. Without sufficient foundation, the jury was left to speculate about the nature of Mr. Hobbs's prior contact with the police, some of which was apparently so substantial that the officers remembered Mr. Hobbs thirty years later. We also acknowledge that jurors may attribute more weight to a law enforcement officer's opinion over that of a lay person. The Defendant is entitled to a new trial on this basis.

### III.    *Prior Bad Acts and Convictions*

The Defendant contends that the trial court abused its discretion by permitting the State to cross-examine Mr. Hobbs regarding prior criminal behavior not resulting in a conviction. The Defendant argues that although a jury-out hearing was held, the court did not find that a reasonable factual basis existed that Mr. Hobbs engaged in the behavior and that the conduct alleged did not bear on Mr. Hobbs's truthfulness. The Defendant acknowledges that no contemporaneous objection was made and requests plain error review.

The State responds that plain error relief is not warranted because it is not clear from the record what occurred in the trial court—specifically, whether the court found that the evidence was admissible pursuant to Tennessee Rule of Evidence 608 or 609 and whether the State's questioning at trial referred to convictions or conduct not resulting in a

conviction. The State also argues that the Defendant "failed to identify what substantial right was affected by the State's questioning" and that consideration of this issue is not necessary to do substantial justice.

### a. Procedural Facts

Just after the beginning of Mr. Hobbs's trial testimony, the State requested a jury-out hearing and announced its intent to impeach Mr. Hobbs using his prior criminal history. During the hearing, Mr. Hobbs denied that he had been "convicted of anything" other than driving with a suspended license; however, he agreed that he had been previously convicted of "secreting the property of another." Mr. Hobbs noted that the charge was reduced to "criminal trespassing or something like that."

Defense counsel interjected and noted that the convictions to which the prosecutor referred were for misdemeanor offenses occurring in the 1980s. Mr. Hobbs stated that he did not recall past convictions for arson; vandalism in 1995; vandalism in 2000, which Mr. Hobbs noted was related to his accidentally discharging a firearm inside his coat; and failure to appear. Mr. Hobbs testified that he had been self-employed for his working life and that he had installed underground cable lines, performed irrigation work, owned and operated dump trucks, worked with asphalt, and "moved houses."

Mr. Hobbs stated that Roy Lee Clark was his father-in-law and that Mr. Hobbs was subpoenaed to testify at a grand jury hearing related to Mr. Clark. Mr. Hobbs noted that he was not called as a witness at Mr. Clark's trial. When asked whether he received consideration for his grand jury testimony relative to any pending criminal charges, Mr. Hobbs denied that he had ever had "any charges." Mr. Hobbs denied ever working at Mr. Clark's "junk yard," although he acknowledged that he "trade[d] cars" there. Mr. Hobbs denied ever taking stolen equipment to the junk yard. Mr. Hobbs agreed that he had been stopped by police on his way to Kentucky twenty-five years previously; he denied that the car he was driving was stolen or that he referred to "anything illegal" while in a police cruiser. Mr. Hobbs denied having a reputation in the community for being a "chop shop owner" or a thief. Mr. Hobbs stated, "I have no criminal behavior. I've not been convicted of anything . . . . I have not done anything illegal[.]"

The trial court noted that Rules 608 and 609 generally limited questioning about prior criminal behavior or convictions to the past ten years and asked the State for the most recent incident it sought to discuss, noting that the court was in law school when "Roy Lee Clark was in trouble," which the court characterized as a "long time ago." The State responded,

Your Honor, again, I think what's important here is that we now have somebody who's coming up here whose credibility is of the utmost importance to this trial here. If he has convictions of criminal behavior that happened in the past, his character for truthfulness, his character is very important in this case.

. . . .

Your Honor, he has things that's he's done that he's been charged with, but not convicted of. The most recent one . . . in Knox County is 2002. And then . . . in Blount County a violation of probation, 10-8 of 2018 . . . . [and] a failure to appear, 6-25 of 2018 . . . . [and a] failure to appear on a felony charge, 5-12 of 2017[.]

. . . .

In Blount County he has a failure to appear on 9-25, 2014 . . . . a reckless endangerment felony on 7-8 of 2012 . . . . an attachment for contempt, driving without a license, and a seat belt violation from 11-16 of 2008.

In Knoxville . . . there's a failure to appear on a domestic . . . that might've been dismissed.

The State continued to list Grainger County convictions for failure to appear and vandalism in 2000; vandalism and reckless endangerment in 1999; driving with a suspended license in 1998; and a violation of probation "for [driving under the influence] and reckless driving" and a domestic violence offense in 1995. The prosecutor stated that the State's position was that Mr. Hobbs was "a defendant who has continued with criminal behavior for a long period of time . . . as this [National Crime Information Center (NCIC) printout] indicated" and that "the State should be allowed to go into his history of being a chop shop owner if [Mr. Hobbs was] going to be saying that, in fact, there was some conversation that he was involved in about getting equipment and using the equipment for some other purposes." The prosecutor averred that she had witnesses who would testify "to his reputation in this community of being that of a chop shop owner and being somebody that's dishonest."

The trial court found that the State could cross-examine Mr. Hobbs "about everything that occurred in Blount County that [was] within the last ten years. That [was] relevant inquiry on cross[-]examination. But this other stuff, [was] just simply too old." The court noted that the State could introduce reputation evidence through other witnesses. The State responded, "But I would also like to ask him about whether or not he owns a

chop shop or has ever owned a chop shop.  I mean, this is the type of person that you take equipment like this to, your Honor, you see why . . .[.]"  The court replied, "[I]f it was a year ago or five years ago, I'd let you ask that question.  We're talking about [thirty-five] years ago.  We're not going there."

After the prosecutor asked for clarification about the permissible scope of cross-examination, the trial court reiterated that the State was not to ask Mr. Hobbs about whether he ever owned a chop shop.  The court stated that the State was permitted to cross-examine Mr. Hobbs about "either specific instances of conduct within – what [the court] just gave [the State] permission to do, the Blount County issue, which are either 608 or 609."  The State noted that it was unaware Mr. Hobbs would testify, and it requested more time to investigate Mr. Hobbs's criminal history.  The court stated that the State had one hour during lunch to investigate, that the court would not ask the jury to come back for another day "to find out more about this witness," and that the court was giving the State "a certain amount of latitude" in cross-examination to "have free rein" and ask Mr. Hobbs "about anything within the last ten years.  Any criminal conduct that he has."  The court noted that reputation witnesses would be permitted "as long as they meet the proper foundation of requirements[.]"

Near the end of direct examination, defense counsel asked Mr. Hobbs how long he had worked in landscaping.  Mr. Hobbs stated that he had worked with equipment beginning at a young age, that his father took him on jobs in 1967, and that he "knew what equipment r[a]n like before [he] knew [his] A, B, C's."  When asked how often he bought and sold large pieces of landscaping equipment, Mr. Hobbs responded, "I've traded on old equipment my whole life.  As a matter of fact, I met [co-defendant Lawson] by buying some old wor[n] out landscape equipment.  He had some mowers and . . . I bought some stuff off him."  Defense counsel proceeded to ask Mr. Hobbs how he would determine the value of a Bobcat, and he stated that although he never saw the Bobcat at issue in this case, he would consider the model, year, and condition of the machine.

At the conclusion of direct examination, the State requested a bench conference. The trial court noted that defense counsel had "just made relevant what [Mr. Hobbs had] done for a living for the last 35 years."  The court told the prosecutor that she was permitted to question Mr. Hobbs regarding his involvement in chop shops, but cautioned her not to ask about specific instances of conduct.  Mr. Hobbs denied ever having owned or participated in a chop shop operation.

### b.  Applicable Law

The doctrine of plain error only applies when all five of the following factors have been established:

-31-

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Tennessee Rule of Evidence 608(b) provides that a witness may be questioned regarding specific instances of conduct "for the purpose of attacking . . . the witness's character for truthfulness." Upon request, the trial court must hold a jury-out hearing to "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry" prior to questioning regarding a specific instance of conduct. Tenn. R. Evid. 608(b)(1). Generally, the specific conduct must have occurred within ten years before the commencement of the prosecution; older conduct may be admissible after notice is given and a judicial determination made that the probative value of the evidence "supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 608(b)(2).

Tennessee Rule of Evidence 609 allows a witness to be impeached by evidence of a prior criminal conviction so long as the convicting offense was a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a). Generally, evidence of a conviction is not admissible if "a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution." Tenn. R. Evid. 609(b). However, older convictions may be admissible "if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence" and the trial court determines "in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."

This court reviews a trial court's ruling on the admissibility of previous criminal behavior pursuant to Rule 608(b) or a prior conviction pursuant to Rule 609 under an abuse of discretion standard. See State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002) (stating the standard of review relative to Rule 608(b)), State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003) (stating the standard of review relative to Rule 609). However, a trial court's decision is not entitled to deference by this court when it fails to substantially comply with

the procedural requirements outlined Rules 608(b)[17] and 609. See State v. Lankford, 298 S.W.3d at 176, 182 (Tenn. Crim. App. 2008) ("Just as in Rule 404(b), we now conclude that if a trial court fails to comply with the procedural requirements of Rule 609, then the court's decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court.").

> c. Analysis

As a preliminary matter, although the trial court's discussion of the relevant impeachment evidence referenced both Rules 608 and 609, the record reflects that during the jury-out hearing, the State sought to introduce two broad classes of information: Mr. Hobbs's criminal history, which apparently contained both felony and misdemeanor convictions, as well as charged conduct that was ultimately dismissed, and Mr. Hobbs's alleged participation in Roy Lee Clark's chop shop operation. The State's protestation on appeal that the record is so unclear as to "hamper[] this [c]ourt's ability to review the admissibility" of the evidence and exercise plain error review draws a distinction without a difference; the prescribed procedure at trial and our standard of review are substantially similar[18] regardless of whether impeachment evidence is governed by Rule 608(b) or 609. The transcript otherwise clearly establishes what occurred in the trial court, including the specific evidence at issue, the arguments of the parties, and the court's findings.

Here, the trial court conducted an appropriate jury-out hearing, wherein Mr. Hobbs gave contradictory testimony when asked about his past convictions and criminal behavior, denying that he had ever been charged or convicted of any crime while also admitting that he had been convicted of secreting the property of another and driving with a suspended license. However, after hearing the prosecutor's recitation of Mr. Hobbs's NCIC record, which was not entered as an exhibit, the court found that the State could cross-examine Mr. Hobbs about all criminal behavior from Blount County in the past ten years. The court made no findings regarding the nature of the convictions or the probative value or prejudicial effect of the behavior, and it did not consider whether a reasonable factual basis existed for the non-conviction inquiries. Accordingly, the court's decision is not entitled to a deferential standard of review, and we must independently determine the admissibility of the impeachment evidence. See Lankford, 298 S.W.3d at 182.

The jury consequently heard questions regarding a 2018 violation of probation, a 2018 failure to appear, a 2017 failure to appear on a felony charge, and a 2012 reckless

---

[17] The same standard that applies Rule 609 also logically applies to Rule 608(b).

[18] The only procedural difference is an additional finding by the trial court that a reasonable factual basis exists for the inquiry into criminal behavior not resulting in a conviction. Tenn. R. Evid. 608(b).

endangerment. Only the 2017 failure to appear and 2012 reckless endangerment [19] charges would have been felonies if they had been established to involve convictions. See Tenn. Code Ann. § 39-13-103(b)(2); § 39-16-609(e) (2017). Mr. Hobbs acknowledged having been on probation for driving with a suspended license and having failed to appear, but he denied having been convicted of a felony, and he averred that the reckless endangerment charge was dismissed. He never clearly admitted to or denied having violated his probation. The State did not seek to prove any of the convictions with extrinsic evidence.

Although the Defendant's issue on appeal is limited to criminal behavior not culminating in a conviction under Rule 608(b), his appellate brief assumes that all of the convictions mentioned during the State's questioning were criminal behavior. We agree with the Defendant's inference that Mr. Hobbs's convictions were not adequately proven.

It bears repeating that "our supreme court has held that NCIC reports 'are not admissible as a substitute for certified copies of court convictions nor for any other purpose.'" State v. Michael R. Smart, No. M2009-02262-CCA-R3-CD, 2011 WL 1431984, at *4 (Tenn. Crim. App. Apr. 12, 2011) (quoting State v. Buck, 670 S.W.2d 600, 607 (Tenn. 1984)). "While the decision in Buck related to the admissibility of NCIC reports at a sentencing hearing, this court has held that the State may not use an NCIC report as a basis for impeaching a witness with a prior conviction. Id. (citing State v. Philpott, 882 S.W.2d 394, 403 (Tenn. Crim. App. 1994)).

Nevertheless, even if every behavior addressed in the State's cross-examination resulted in a conviction, we cannot say that misdemeanor vandalism, driving with a suspended license, failure to appear, or violating one's probation involve dishonesty such that they would have been relevant to Mr. Hobbs's character for truthfulness. See State v. Walker, 29 S.W.3d 885, 890 (Tenn. Crim. App. 1999) (stating that Rule 609 impeachment evidence is limited to felonies and convictions for misdemeanor offenses involving dishonesty). Alternatively, if the behavior did not relate to a conviction, no factual basis for the incidents was offered by the State, and their probative value was minimal. Questioning regarding these incidents was in error.

Relative to the two supposed felony convictions for failure to appear and reckless endangerment, had the State properly established them, they would have been properly admitted for impeachment purposes. Because the State failed to satisfy its burden, admission of the convictions was in error.

---

[19] Mr. Hobbs acknowledged that this charge stemmed from his firing a gun into the air on the Fourth of July; reckless endangerment involving a deadly weapon is a Class E felony.

Although the Defendant does not raise the trial court's allowing the State to question Mr. Hobbs about the chop shop allegations, because we are reversing the convictions, we also note that the court's determination that Mr. Hobbs "made relevant" his character for the past thirty years, thereby opening the door to questioning about the thirty-year-old chop shop operation, was an abuse of discretion. Although a witness can "open the door" to cross-examination regarding past criminal behavior by averring that he has generally acted lawfully[20] or that he had never committed illegal acts, we disagree with the trial court that Mr. Hobbs's stating that he had worked on vehicles with his father in childhood and that he owned a business for thirty years "made relevant" his character for the past thirty years.

Even assuming, for the sake of argument, that Mr. Hobbs created a misleading impression of his law-abiding character, our supreme court has recently observed that "the remedy sought after a party has opened the door should be both relevant and proportional," as well as "limited to that [evidence] necessary to correct a misleading advantage created by the evidence that opened the door." State v. Vance, 596 S.W.3d 229, 251 (Tenn. 2020) (internal citation omitted). "The fact that 'the door has been opened' does not permit all evidence to pass through because the doctrine is intended to prevent prejudice and is not to be subverted into a rule for the injection of prejudice." Id. (quoting State v. Gaudet, 972 A.3d 640, 646 (N.H. 2014) (internal citations omitted)). Accordingly, a trial court "must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued," including weighing the probative value of the evidence against the risk of unfair prejudice. Id. (quoting State v. Phillips, 927 A.2d 931, 943 (Conn. App. 2007) (internal quotation omitted)); see State v. James, 677 A.2d 734, 742 (N.J. 1996) (stating that evidence may still be excluded when the trial court finds that the probative value "is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury[.]") (quoting N.J. R. Evid. 403).

We note that although Mr. Hobbs made general denials of criminal behavior during the jury-out hearing, he never testified in front of the jury regarding the nature of his conduct in general, and simply stating that one is experienced in a specific industry or owned a business for many years does not speak to one's character, for good or for ill. The court's determination that Mr. Hobbs opened the door to inquiry into his character over the span of thirty years was error. Moreover, the court failed to make findings of fact indicating that it had weighed the probative value and prejudicial effect of the chop shop evidence in rendering its decision.

---

[20] See Tenn. R. Evid. 608, Advisory Comm'n Cmts ("If the witness makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness, as rebuttal of the broad claim would itself tend to show untruthfulness.").

Further, a reasonable factual basis for the conduct was lacking such that the State should not have been allowed to pursue this line of questioning. At the jury-out hearing, the State candidly informed the court that it was attempting to establish Mr. Hobbs as a person "who has continued with criminal behavior for a long time," as well as his reputation for being a "chop shop owner and being somebody that's dishonest." The record reflects that the prosecutor's basis for this information was in large part Mr. Humphrey, who recalled that unidentified detectives told him in the late 1970s to be alert for vehicle and equipment thefts by Mr. Hobbs and unnamed other individuals. The only other fact tangentially connecting Mr. Hobbs to the chop shop was his in-law relationship to Mr. Clark. For his part, Mr. Hobbs maintained that he had never been involved in a chop shop. The court made no explicit finding regarding the factual basis for the chop shop allegations, and we question whether the State's assertions on the topic provided an adequate factual basis to permit questioning under Rule 608(b).[21]

This court has noted that "[t]o the extent possible, the party seeking to introduce the evidence [of specific instances of conduct] should present extrinsic proof of the . . . conduct at the jury-out hearing"; however, if "'the realities of trial make it impossible to do so, the attorney proposing to ask the question should, at a minimum, clearly state on the record the source and origin of the information underlying'" the instance of conduct. State v. Wyrick, 62 S.W.3d 751, 781 (Tenn. Crim. App. 2001) (quoting State v. Nesbit, 978 S.W.2d 872, 882 (Tenn. 1998)). Here, Mr. Humphrey did not have firsthand knowledge of any conduct by Mr. Hobbs that would provide a reasonable factual basis for the inquiry. See Wyrick, 62 S.W.3d at 781 (discussing that a factual basis was questionable, but permissible, when defense counsel averred that the victim's family members had communicated that the victim made a previous false accusation, but did not disclose whether they personally heard the accusation; the court noted other, clearer circumstances in another case in which "the prosecutor pointed to a specific person who had first-hand knowledge of the specific instances of conduct"). We conclude that the questionable probative value of the more than thirty-year-old allegations regarding Mr. Hobbs's involvement with a chop shop, which were not supported by a reasonable factual basis and which Mr. Hobbs denied, did not substantially outweigh its unfair prejudicial effect upon the jury, and inquiry into such conduct was improper cross-examination under Rule 608(b).

However, we are constrained to agree with the State that under plain error review, the numerous departures from the Rules of Evidence relative to Mr. Hobbs's criminal

---

[21] We note that although the court cautioned the State against referring to specific instances of conduct during its inquiry relative to the chop shop, the allegations constituted a specific instance of conduct. See, e.g., Nesbit, 978 S.W.2d at 884 (reviewing allegations that the defendant generally practiced satanic worship as specific instances of conduct).

record and prior criminal behavior would not, standing alone, entitle the Defendant to relief because the Defendant's substantial rights were not affected. Although Mr. Hobbs was cross-examined regarding a variety of relatively minor criminal behavior, he disputed aspects of his criminal record and firmly denied having been part of a chop shop organization or having possession of stolen vehicles. The briefly-referenced criminal behavior did not reflect on the Defendant directly, and the jury clearly credited part of the defense theory that Mr. Hobbs sought to corroborate, that being the Defendant was under a mistaken impression regarding Mr. Lawson's authority to borrow the Bobcat. The Defendant is not entitled to plain error relief on this basis.

### IV. Cumulative Error

The Defendant contends that even if each of the above-referenced errors do not entitle him to a new trial standing alone, the cumulative effect of the errors deprived him of a fair trial. The State responds that the Defendant waived this issue by failing to raise it in the motion for a new trial; alternatively, the State argues that no error occurred. We have concluded above that the Defendant is entitled to a new trial because of the erroneous admission of the reputation or opinion evidence relative to Mr. Hobbs. However, in the event of further review, we conclude that even if this error were held to be harmless standing alone, the Defendant would be entitled to a new trial under a cumulative error analysis.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77.

This court has previously waived consideration of cumulative error in some cases when it was not raised in the motion for a new trial; however, we recognize that arguing cumulative error at the motion for a new trial is awkward at best. We note that in the relevant previous cases waiving cumulative error, this court also briefly addressed the merits of the issue and stated that no error occurred. cf. State v. Wilkins, 749 S.W.2d 753, 755 (Tenn. Crim. App. 1988) (waiving consideration of cumulative error when the appellate briefs were inadequate and the issue was not raised in the motion for a new trial; in addition, this court determined that the defendants' issues were either waived or without merit); State v. Quincy D. Scott, No. E2017-01416-CCA-R3-CD, 2018 WL 3156979, at *2 (Tenn. Crim. App. June 27, 2018) (noting the State's argument that cumulative error

was waived for failure to raise it in the motion for a new trial, but concluding that the defendant waived his individual claims of error due to inadequate briefing; because no individual error had been established, no cumulative error existed); State v. Korie Bates, No. W2004-00686-CCA-R3-CD, 2005 WL 1215963, at *8 (Tenn. Crim. App. May 20, 2005) (waiving appellant's cumulative error for failure to raise it in the motion for a new trial and noting that no individual error existed). In any event, this court may consider an error "that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial[.]" Tenn. R. App. P. 36(e). Because we conclude below that the Defendant is entitled to a new trial based upon the cumulative effect of the errors in his case, we decline to waive this issue.

The individually harmless errors we have identified are as follows: (1) Mr. Humphrey's having been sworn as a witness; (2) the trial court's eliciting Mr. Clark's full name from Mr. Hobbs; and (3) the court's admission of irrelevant and prejudicial evidence regarding Mr. Hobbs's involvement in chop shops and misdemeanor convictions or behavior not bearing on dishonesty. In addition, we concluded above that the admission of the police witnesses' opinion or reputation evidence was reversible error; in the event that this error is held to be harmless, it would also appropriately be considered in the context of cumulative error.

The cumulative effect of the above-referenced errors entitle the Defendant to relief. As acknowledged by the State at trial, Mr. Hobbs played a critical role in the defense theory—he was the only witness who corroborated the Defendant's account of the work trade arrangement and the Defendant's impression that co-defendant Lawson was a co-owner of Southern Grounds with authority to borrow the Bobcat. These multiple errors jointly sent a message to the jury that that Mr. Hobbs was a shady character who had attracted the continuing attention of the police for at least thirty years; moreover, the trial court itself connected Mr. Hobbs to a notorious criminal and convicted murderer, although no evidence showed that any juror was aware of the meaning of the court's comments. Given that the jury found the Defendant to be less than criminally responsible for the theft, we conclude that the improper assault on Mr. Hobbs's credibility more probably than not affected the jury's verdict to the Defendant's prejudice. See State v. Herron, 461 S.W.3d 890, 910 (Tenn. 2015) (discussing that reversal for cumulative error was warranted when multiple non-constitutional errors more probably than not affected the verdict); see also Tenn. R. App. P. 36(b) (stating that this court may grant relief when "considering the whole record, error involving a substantial right more probably than not affected the judgment[.]"). The Defendant is entitled to a new trial conforming to the dictates of our Rules of Evidence.

*V.      Clerical Error in Judgment*

–38–

Although it was not raised by either party, in the event of further appellate review, the record reflects that a clerical error exists in the judgment for Count 2, facilitation of theft of property, as it pertains to the jury's finding regarding valuation. The judgment form states that the Defendant was convicted of facilitation of theft of property valued at $10,000 or more but less than $60,000. However, the jury's verdict form reflects that it found the value of the property to be "more than" $2,500 but less than $10,000. Nevertheless, the judgment form reflects the correct felony class, and the Defendant received an in-range sentence relative to Count 2 for a Class E felony as a career offender.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed, and the case is remanded for a new trial on Counts 2, 4, 5, and 6, in accordance with this opinion; because the Defendant was acquitted by the jury of theft in Count 2, on retrial, the charge in Count 2 should be facilitation of theft, and the jury should be instructed on any lesser-included offenses the trial court finds applicable. See State v. Rush, 50 S.W.3d 424, 432 (Tenn. 2001), as amended (July 25, 2001) (citing State v. Maupin, 859 S.W.2d 313 (Tenn. 1993) (allowing retrial on lesser-included offenses but prohibiting retrial on the greater offense)).

_____
D. KELLY THOMAS, JR., JUDGE